IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DONTRE JOHNSON,

                           Plaintiff,                         OPINION AND ORDER

    v.

                                                         23-cv-455-wmc

SHELLY DENO, and
NICHOLAS RICE,

                           Defendants.

---

As an incarcerated person now at Stanley Correctional Institution representing himself, Dontre Johnson filed a complaint under 42 U.S.C. § 1983, claiming that Jackson Correctional Institution ("JCI") officers Shelly Deno and Nicholas Rice violated his civil rights. (Dkt. #1.) The court granted plaintiff leave to proceed on a First Amendment free exercise claim against these same defendants for substantially burdening his ability to practice Christianity by withholding a Bible from him for 23 days. (Dkt. #10.) The parties have since cross-moved for summary judgment. (Dkt. #19 and Dkt. #28.) For the reasons explained below, the court will now deny plaintiff's motion and grant defendants' motion.

UNDISPUTED FACTS

**A. Background**

Dontre Johnson is a self-described Christian, who practices daily by reading and meditating on the Bible. (Johnson Decl. (dkt. #22) ¶ 5.) Johnson was previously an inmate at JCI, where he was housed in the Neillsville Unit as part of the general population. (*Id.* at ¶ 4.) Sherry Deno is a Correctional Officer that handles day-to-day operations in the Neillsville Unit, and Nicholas Rice is a Corrections Program Supervisor ("CPS") that

oversees the Neillsville Unit. (Deno Decl. (dkt. #33) ¶¶ 2-3, 5; Rice Decl. (dkt. #32) ¶¶ 2-3.)

### B. JCI's Property Policies

For numerous security reasons, JCI regulates the property that an inmate may possess. (Rice Decl. (dkt. #31) ¶ 5.) These reasons include preventing: contraband from entering the institution; inmates from possessing items that can be used dangerously; and the hoarding of property in tight living spaces. (*Id*.); *see* Wis. Admin. Code Div. Adult Insts. § 309.20.03. In particular, JCI closely regulates inmates' possessions while they are held in the Restricted Housing Unit ("RHU"), because the RHU population presents additional security issues. (Dunahay Decl. (dkt. #32) ¶ 6.) For example, most inmates are moved to RHU because they have violated institution rules, behaved poorly, or were assessed as a danger to themselves or others. (*Id*.) This includes inmates placed in Temporary Lock-Up ("TLU") for disciplinary reasons, which is part of RHU. (*Id*.)

After an inmate is transferred to the RHU, third-shift staff at JCI typically collects the inmate's belongings from general population housing, setting aside the limited items that he may keep with him in RHU and storing any other items. (Dkt. #31-4.) The officer separating and packing an inmate's belongings takes an inventory of all items sent to RHU on Form DOC-1128; then another officer in the RHU takes another inventory of those same items upon receipt on that same form. (*Id*.) The inmate must also review the filled-out form and the items themselves with an RHU security officer, then sign the form to verify that he has received the belongings listed on the form. (*Id*.)

2

While in RHU, property regulations allow an inmate to keep four of his own books, in addition to one of his own religious texts. (Rice Decl. (dkt. #31) ¶ 8; Dkt. 31-2, at 6.) He also can borrow another four books from the RHU library, *including* religious texts and the Bible. (Rice Decl. (dkt. #31) ¶ 8; Dunahay Decl. (dkt. #32) ¶ 11.) However, for safety purposes, any book that an inmate keeps in the RHU must also be softcover. (Rice Decl. (dkt. #31) ¶ 8; Dkt. 31-2, at 6.)

Further, because RHU placement is designed to be temporary, an inmate can only switch out his personal books every 30 days with other books from his packed-up, personal belongings set aside when transferred from JCI's general population housing. (Rice Decl. (dkt. #31) ¶ 11; Dunahay Decl. (dkt. #32) ¶ 6; Dkt. #31-3, at 8.) The purpose of this restriction is to prevent potential loss or misplacement of inmates' personal property and prevent an "unnecessary amount of work on staff and resources, when all of the property is not used during a shortened time." (Rice Decl. (dkt. #31) ¶ 11; Dunahay Decl. (dkt. #32) ¶ 6.) An inmate slated to spend less than 90 days in the RHU is also directed to send any requests for personal belongings to the corrections officers in their former housing units. (Dkt. #22-3, at 2.)

C. **Johnson's Requests for his Personal Bible**

In January 2023, Johnson was transferred from Neillsville Unit to the RHU, where he was to spend 60 days because of a disciplinary conduct report. (Johnson Decl. (dkt. #22) ¶ 2; Dkt. #32-1, at 26.) He received his personal property from Neillsville Unit on January 17, 2023, at which point he was required to review his form DOC-1128, which

3

inventoried his personal belongings sent to the RHU. (Dkt. #31-4.) Specifically, Johnson's form stated that he had been forwarded one personal item in the category of "Bible/Koran/Religious Text – as books." (*Id*.) Although Johnson signed his form DOC-1128 on January 17, 2023, his Bible was not among his belongings sent to the RHU, nor apparently was any other religious text. (*Id*.); (Johnson Decl. (dkt. #22) ¶ 11)

Before Johnson ever received any of his belongings, he had already sent a property request form to Correctional Officer Deno on January 16, 2023. (Dkt. #22-2, at 1.) Among other items requested, Johnson asked for his Bible, which unfortunately was hardcover. (*Id*.; Dkt. #32-1, at 2.) Specifically, he wrote, "I would like these items from my property: … [two other books], 1 Hand Bible." (Dkt. #22-2, at 1.) By the time Officer Deno reviewed Johnson's request form on January 20, 2023, however, his Form DOC-1128 had already been completed. (*Id*.) Thus, she responded to Johnson's request by advising, "Your pack-up TLU property shows you were sent 4-books. That's all that's allowed." (*Id*.)

In addition, Deno attests that she reviewed Johnson's DOC 1128 form, which indicated he had one religious text in his possession in the RHU. (Deno Decl. (dkt #33) ¶ 8.) Thus, she "believed he had already received his one religious text, and four softcover books; therefore, I wrote Johnson back telling him that already received his four books and that was all that he was allowed." (*Id*.) Because she did not personally pack his property, Deno further attests that she did not know whether he owned more than one religious text. (*Id*. ¶ 9.) More specifically, Officer Deno attests that she "did not purposely deny Johnson

4

his Bible"; rather, based on her review of the DOC-1128 inventory form, Deno believed that Johnson already had a religious text as allowed by policy. (*Id*. ¶ 10.)

Regardless, after hearing back from Officer Deno, Johnson sent another property request to Neillsville Unit's Supervisor Rice, on January 23, 2023. (Dkt. #22-2, at 2-3.) This time, Johnson represented,

> "On or around 01/17/2023, I was issued TLU property that was selected by someone in Neillsville randomly. The issued items are things that I do not need here in segregation. I will render them over to be placed back in my overall property. [Instead,] I would like to request these items: [1] small hand bible, [2] hand dictionary, [3] blue prison litigation handbook [and 4] black battling the administration handbook."

(*Id*. at 3.) In addition, Johnson requesting two, different folders containing "legal work" and "typing paper." (*Id*.) Rice then apparently delegated any follow-up to a lower officer, who responded by saying, "He received 4 books." (*Id* at 2.)

Apparently after receiving a copy of this response, Johnson wrote to Rice again, saying: "This is my third attempt to receive my personal property. I would like: my <u>Hand Bible</u> [and three other books]… I will return the four books that were randomly selected and given to me upon receipt of these four books." (Dkt. #22-2, at 4 (emphasis in original.)) Rice himself responded to Johnson at this point, explaining that: "Per policy you can exchange after either 30 or 35 days. 4 Books were given for TLU." (*Id*.) Even so, Rice now states in his declaration that he did "not intend to deprive Johnson of his religious textbook [but] … believed [he] was following policy by allowing Johnson to have one religious text in his cell, based on the documentation [DOC-1128] received." (Rice Decl. (dkt. #32) ¶ 20.) Because Rice did not personally pack Johnson's property, he further attests to being unaware that Johnson "had not been issued his Bible when he went to

5

TLU," nor, at the time he responded, was he aware that Johnson "did not receive it because it was hardcover." (*Id*. ¶¶ 19-20.)

After three failed attempts to obtain his Bible from Neillsville staff, Johnson next wrote to JCI's Inmate Complaint Examiner ("ICE"), who responded that he should contact Captain Erin Dunahay, the supervisor of the RHU at that time. (Dkt. #22-2, at 5; Dunahay Decl. (dkt. #32) ¶¶ 2-3.) Accordingly, Johnson further wrote Dunahay a follow-up letter, explaining that in "an attempt to follow protocol as outline in Wis. Adm. Code DOC 310," he had "been denied on three occasions [his] Holy Bible" and "would like for my Bible from my property to be issued to [him]. The other matter of being denied [his] Bible since 01/16/2023 will be addressed through the 310 protocol." (Dkt. #22-2, at 5.) In response, Captain Dunahay then advised Johnson that, "You should have addressed this with me sooner. I sent [a copy to] Rice and informed him it's not part of the allowed book for property — it's under its own section — you can have a Bible & 4 books." (*Id*. at 6.) When she spoke to Rice about the incident, Captain Dunahay also attests that Rice said he "believed that Johnson had already received his religious text according to the property receipt signed by Johnson." (Dunahay Decl. (dkt. #32) ¶ 11.)

Ultimately, Johnson was given a small, softcover Bible on February 9, 2023, since he could not have his hardcover, personal Bible while in the RHU. (Dkt. #32-1, at 2.) Captain Dunahay also represents that Johnson could have requested a Bible from the RHU library at any time or discussed the issue with her personally, as she conducted her weekday rounds, which she says would have enabled her to obtain a Bible for him more promptly. (Dunahay Decl. (dkt. #32) ¶ 11.)

6

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact[,] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must provide evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009). In reviewing the evidence, the court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

An incarcerated person maintains a limited First Amendment right to practice his religion while in prison. *Tarpley v. Allen Cnty.*, 312 F.3d 895, 898 (7th Cir. 2002). To show that prison officials violated this right at summary judgment, a plaintiff must "submit evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (citing *Thompson v. Holm,* 809 F.3d 376, 379 (7th Cir. 2016)). More specifically, to survive summary judgment, a plaintiff must set forth evidence from which a reasonable jury could conclude that prison officials *intentionally* burdened his religious practice. *Thompson*, 809 F.3d at 380-381; *see, e.g., Garner v. Muenchow*, 715 F. App'x 533, 536 (7th Cir. 2017) ("The only real issue is whether the record allows a factfinder to conclude that the defendants *intended* to prevent [plaintiff] from practicing [his religion].") (emphasis added).

Certainly, intentionally preventing an incarcerated person from accessing an essential religious text like the Bible is considered a substantial burden on his religious practice. *See Garner*, 715 F. App'x at 536 (citing *Sutton v. Rasheed*, 323 F.3d 236, 253–57 (3d Cir. 2003); *Kay v. Bemis*, 500 F.3d 1214, 1220 (10th Cir. 2007)). However, plaintiff has not provided evidence from which a reasonable jury could conclude that defendants did so intentionally. To begin, there is no reasonable dispute that Officer Deno and Supervisor Rice: (1) did not pack Johnson's belongings; (2) had no personal knowledge of any religious texts he owned; and (3) after receiving his requests for his Bible, reviewed his DOC-1128 inventory form before responding, which indicated that Johnson already possessed the one religious text permitted by the RHU property regulations. (Deno Decl. (dkt #33) ¶¶ 8-10; Rice Decl. (dkt. #32) ¶¶ 17-20.) Regardless, Johnson's requests for his Bible addressed to both defendants Deno and Rice also unfortunately failed to convey that he was not in possession of *any* religious text while he was in RHU. Instead, he stated that he would swap out the books that he already had (which, from the DOC-1128 form, looked to include his one permitted religious text) in exchange for his Bible. (Dkt. #22-2, at 1-4.) In other words, the record shows that Johnson was denied access to his Bible at worst as the result of a miscommunication, not due to either of the named defendants' intentional actions. Moreover, since Johnson continued to insist on receipt of his *hard cover*

8

Bible, which violated safety protocols in the RHU (no doubt because the covers could be fashioned into a weapon), the request would have had to be denied anyway.[1]

As a result, no reasonable jury could conclude that these defendants intentionally withheld Johnson's Bible from him while he was in the RHU. *See Garner*, 715 F. App'x at 536-537; *Thompson*, 809 F.3d at 380-381. To the contrary, the evidence of record at summary judgment shows that defendants had every reason to assume Johnson's DOC-1128 inventory form accurately reflected his receipt of an allotted, single religious text at the time defendants responded to his request for his personal Bible. Further, they were entitled to rely on Johnson's own written confirmation on that form. *See Krispin v. Core*, No. 09-CV-292-BBC, 2010 WL 547534, at *3 (W.D. Wis. Feb. 11, 2010) ("Although plaintiff may have wanted defendants to infer that he needed [other accommodations], prison officials are not required to be mind readers.") (citing *Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004)).

Thus, the result of defendants' original misunderstanding, which contributed to plaintiff unfortunately being without a Bible for more than three weeks, was no doubt distressing for Johnson, who states that he was "spiritually traumatized" by the experience. (Johnson Decl. (dkt. #22) ¶¶ 12-14.) However, without submitting any evidence that defendants intentionally withheld his personal Bible from him, Johnson cannot sustain his free exercise claim. *See Garner*, 715 F. App'x at 536-537; *Thompson*, 809 F.3d at 380-381.

---

[1] Certainly, a reasonable accommodation could have been made sooner by suggesting plaintiff obtain a soft cover bible from the library or through a separate purchase, but the failure by plaintiff to pursue either avenue is hardly evidence of the defendants' desire to intentionally deprive him of this essential religious text.

Given the undisputed facts, therefore, defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

ORDER

IT IS ORDERED that:

1) Plaintiff's motion for summary judgment (dkt. #19) is DENIED.

2) Defendants' motion for summary judgment (dkt. #28) is GRANTED.

3) The Clerk of Court is directed to close this case.

Entered this 16th day of December, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge